1
2
3
4
5
6
7

8              UNITED STATES DISTRICT COURT

9         FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   FRANK VASQUEZ,                          Case No.   1:19-cv-01063-JDP

12                   Petitioner,             FINDINGS AND RECOMMENDATIONS TO
                                             DENY PETITION FOR WRIT OF HABEAS
13          v.                               CORPUS AND TO DECLINE TO ISSUE A
                                             CERTIFICATE OF APPEALABILITY
14   PEOPLE OF THE STATE OF
     CALIFORNIA,                             OBJECTIONS DUE IN THIRTY DAYS
15
                    Respondent.              ORDER DENYING PLAINTIFF'S REQUEST
16                                           FOR IN-CAMERA REVIEW

17                                           ECF No. 1

18

19          Petitioner Frank Vasquez, a state prisoner without counsel, petitioned for a writ of habeas
20
     corpus under 28 U.S.C. § 2254.  ECF No. 1.  Petitioner claims that: (1) his waiver of counsel was
21
     involuntary and (2) the trial court erred when it failed to provide certain jury instructions.  ECF
22
     No. 1 at 5-8.  The petition also contains a request that this court conduct an in-camera review of
23
     certain sealed documents and a sealed transcript for the purpose of determining whether the trial
24
     court improperly withheld evidence from him.  *Id*. at 10.  For the reasons below, the undersigned
25
     denies the request for in-camera review and recommends that the court deny the petition.
26
27
28

**I.      Background**

In 2015, a jury sitting in Tulare County found petitioner of guilty of first-degree murder, second-degree robbery, and being a felon in possession of a firearm.  *See People v. Vasquez*, No. F0727362018, Cal. App. Unpub. LEXIS 1126, at *1 (Feb. 21, 2018); ECF No. 12-10 at 2. Petitioner's sentence was enhanced by findings that the murder was committed during the commission of a robbery and that he personally and intentionally discharged a firearm during the crimes.  *Id*.  Petitioner was sentenced to life in prison without the possibility of parole plus an additional aggregate term of 32 years to life for the murder conviction and 17 to 25 years to life for the robbery conviction.  *Id*.  The undersigned sets forth below the facts of the underlying offenses, as stated by the California Court of Appeal.  A presumption of correctness applies to these facts.  *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

**I. Relevant Facts from The Prosecution's Case-In-Chief**

Two witnesses, Luis Acevedo (Luis) and Socorro Bravo, observed Ibarra's murder.  A third witness, Guillermo Acevedo Cano (Luis's brother), was inside Ibarra's residence but asleep when the incident occurred.  A fourth witness, Rogelio Buenrostro, saw [petitioner] at Ibarra's residence before the murder, but Buenrostro left before the shooting occurred.

**A. The murder**

**1. Luis's and Bravo's trial testimony**

On November 28, 2014, sometime around 5:00 or 5:30 p.m., Buenrostro, Luis and Bravo were with Ibarra outside near Ibarra's residence.  The men talked, they drank beer, and they ate chips and salsa.  Buenrostro left about an hour later.  Approximately 30 minutes after Buenrostro left, [petitioner] approached the remaining men while holding a shotgun.  A White male was seen with [petitioner].

Ibarra and Luis knew [petitioner] from previous contacts.  At trial, Luis denied knowing about any past problems between Ibarra and [petitioner].  Bravo had only seen [petitioner] once before this fatal encounter.  Bravo lived next door to Ibarra, and Bravo happened to see [petitioner] with a young White male about 2:00 p.m. on the day of Ibarra's murder.

During the fatal encounter, [petitioner] appeared angry and he pointed his shotgun at Ibarra.  [Petitioner] demanded Ibarra to give

2

him his wallet, and everything he had.  Ibarra either did not respond or refused.  Luis told [petitioner] that he was going to take [petitioner] to the residence (a trailer) to give [petitioner] money or whatever Luis could find.  [Petitioner] told Luis to stay there. [Petitioner] fired once, and Ibarra fell down.  The White male ran away when the shot was fired.

After Ibarra was shot and he fell, [petitioner] punched and kicked Ibarra's body.  [Petitioner] took Ibarra's wallet.  Luis fled inside the residence.  [Petitioner] aimed his shotgun at Bravo but told him he would not hurt Bravo.  [Petitioner] told Bravo, "You never saw me," and [petitioner] took off running.

**2. Guillermo's trial testimony**

Inside Ibarra's residence, Guillermo, who had been asleep, woke up when he heard "some beating noise."  He heard arguing and someone shouting at his brother, Luis.  The person yelling was telling Luis not to go inside the residence, but to put his head down on the ground.  Guillermo heard a shot.  Through an open door to the trailer, Guillermo could see a gun pointed at Luis's head.  The person holding the gun pumped it.  At some point, Luis came inside the residence and they both fled through a back window.

**3. The eyewitnesses identify [petitioner] in court as Ibarra's shooter**

At trial, both Luis and Bravo identified [petitioner] in court as Ibarra's shooter.  Guillermo, who explained he had met [petitioner] before and knew his voice, identified [petitioner] in court as the person he heard from inside the trailer when he woke up and saw someone holding a gun to Luis's head.

**B. [Petitioner]'s possible motive**

During Luis's trial cross-examination, he recalled an undisclosed time when [petitioner] had asked Ibarra about money that Ibarra allegedly owed [petitioner].  Ibarra had denied owing [petitioner] anything.

At trial, Buenrostro recalled that he saw [petitioner] at Ibarra's residence earlier on the day of the murder.  Buenrostro knew [petitioner] from past encounters, and Buenrostro was friends with [petitioner's] girlfriend.  Earlier on the day of the murder, [petitioner] had approached Buenrostro near Ibarra's residence and [petitioner] had asked Buenrostro if his friends would sell him drugs.  Buenrostro told [petitioner] that Ibarra did not sell drugs, and [petitioner] replied that Ibarra was "going to be sorry." According to Buenrostro, [petitioner] went to his vehicle, where [petitioner] remained for about 30 minutes before he drove away. Later, Buenrostro left Ibarra's residence and went home.  A short time later, Buenrostro learned that Ibarra had been killed.  On cross-examination, Buenrostro agreed that Ibarra owed [petitioner] money for two days of pruning that [petitioner] had performed for

3

1   him.

2   **C. The autopsy**

3   An autopsy revealed that Ibarra was shot in his chest with a
    shotgun.  He bled to death, and probably died within three to five
4   minutes after sustaining the gunshot wound.  Based on stippling
    around the wound, the pathologist opined that the single shot was
5   fired from four to 12 feet away.

6   **D. Jaime Brannum's trial testimony**

7   Jaime Brannum was [petitioner's] roommate on the day of Ibarra's
    murder.  At trial, Brannum recalled seeing [petitioner] previously
8   holding a shotgun at their residence.  The weapon made Brannum
    nervous so he had asked [petitioner] to remove it from their
9   apartment.

10  According to Brannum, around 3:00 or 4:00 p.m. on the day of
    Ibarra's murder, [petitioner] asked him to drive around with him in
11  [petitioner's] vehicle.  [Petitioner] did not disclose his plans.  They
    drove around to various locations, including several residences.
12  [Petitioner] would exit his vehicle at each residence for about five
    to 10 minutes, while Brannum stayed inside the vehicle.  One stop
13  was at Ibarra's residence, which was very quick.  [Petitioner]
    parked close to Ibarra's residence, got out, and spoke to an "older
14  gentleman" (who was likely Buenrostro).  [Petitioner] returned to
    his vehicle and they drove away.  The sun was going down around
15  that time.  Brannum told the jury that he did not know either Ibarra
    or Luis, although he had "seen their faces before."

16
    According to Brannum, they both returned to Ibarra's residence
17  about an hour later.  This time, [petitioner] parked his vehicle about
    six houses down the street and then he began walking alone towards
18  Ibarra's residence.  [Petitioner] had a long bag with him.  Brannum
    testified at trial that he initially remained in [petitioner's] vehicle,
19  and he denied knowing what [petitioner] was doing.  Brannum
    believed [petitioner] wanted to get some drugs.

20
    After waiting for about 10 minutes, Brannum left the vehicle and
21  walked to Ibarra's residence.  When he got there, he saw
    [petitioner] holding a shotgun down at his side while facing three
22  men.  The shotgun looked similar to the one Brannum previously
    saw [petitioner] holding at their apartment.  According to Brannum,
23  he (Brannum) only walked to a fence that was surrounding Ibarra's
    property.  He denied ever walking close to the other men.  He said
24  he ran away once he saw [petitioner] holding the gun.  At trial, he
    initially testified that he did not hear a gunshot as he fled because
25  music at Ibarra's residence was too loud.  He later changed his
    testimony and claimed to have heard a gunshot as he was running
26  around the corner of the street.  He said he ran to a house around
    the corner where [petitioner's] girlfriend lived.  Brannum later
27  returned to his residence.  At trial, he claimed that he did not see

28

                                    4

[petitioner] again after the shooting.

Brannum told police that he had been home all day on the day of Ibarra's murder. At trial, he admitted lying to police. He claimed he lied because he was scared.

**E. Evidence of [petitioner's] flight**

On December 3, 2014, law enforcement detained [petitioner] while he drove on a highway in Monterey County. A pair of boots were found in the vehicle, along with a packed suitcase with clothing and another pair of boots.

**II. Relevant Facts from The Defense Case**

**A. [Petitioner] denies any involvement in Ibarra's murder**

[Petitioner] testified on his own behalf without the assistance of legal counsel. On the morning of the murder, he claimed that he left his residence with Brannum around 11:00 a.m. [Petitioner] went to Ibarra's residence in an effort to buy drugs. [Petitioner] asked Buenrostro for $20 worth of drugs, which was refused for being too small of an amount to sell. Although he begged, he could not buy drugs there. [Petitioner] was frustrated, and he told Buenrostro that Ibarra would "regret it" if he did not sell him some drugs.

At around 12:00 p.m., [petitioner] dropped Brannum off at a location where Brannum could work. [Petitioner] went to his sister-in-law's house. While there, he drank hard alcohol mixed with beer. He became too intoxicated to drive. His sister-in-law, Rosalva Perez, drove him to his sister's house when it was "already getting dark." At his sister's house, [petitioner] ate and he fell asleep.

[Petitioner] told the jury that his suitcase was packed because he had a preplanned weekend trip with his children at Morro Bay and San Luis Obispo. His children lived in Hawaii and they had come to California to meet him. They took pictures at the beach. He stayed in that area for two nights. Because the lodging was so expensive, he was driving towards Salinas when he was detained by law enforcement.

[Petitioner's] children were not called to testify in this trial. At trial, [petitioner] denied being at Ibarra's residence when this murder occurred, and he denied killing Ibarra. [Petitioner] said Brannum was lying about them returning to Ibarra's residence a second time that day. He admitted that Ibarra owed him money, but he denied being angry with Ibarra. He denied ever having any guns. He believed Brannum was lying about seeing him with a

gun.

**B. Perez's trial testimony**

[Petitioner's] sister-in-law, Perez, testified that [petitioner] arrived at her house at noon on the day of Ibarra's murder. He did maintenance there, finishing around 4:00 p.m. He had been drinking, so she gave him a ride to his sister's house. She dropped him off at his sister's house at around 5:00 p.m. She and her husband's cousin later drove [petitioner's] vehicle and parked it near the house of [petitioner's] sister.

During cross-examination, Perez admitted that when she first spoke to an investigator about her interactions with [petitioner], she only mentioned that [petitioner] left her house at 5:00 p.m. on the day in question. She did not mention driving him to his sister's house.

**III. Prosecution's Rebuttal Evidence**

In rebuttal, the prosecution introduced evidence from Facebook, which depicted a page registered in [petitioner]'s name. The page had multiple photographs, including one showing a person holding a rifle. The detective who testified about this page identified [petitioner] as the person depicted in that photograph.

ECF No. 12-10 at 3-9.

**II.    Discussion**

A federal court can grant habeas relief when a petitioner shows that his custody violates federal law.[1] *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75 (2000). Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), governs a state prisoner's habeas petition. *See Harrington v. Richter*, 562 U.S. 86, 97 (2011). To decide a § 2254 petition, a federal court examines the decision of the last state court to have issued a reasoned opinion on petitioner's habeas claims. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). In general, § 2254 requires deference to the state court system that determined petitioner's conviction and sentence.

Under AEDPA, a petitioner can obtain relief on federal habeas claims that have been "adjudicated on the merits in state court proceedings" only if he shows that the state court's

_____

[1] This court has jurisdiction over the petition pursuant to 28 U.S.C. § 2241(a): "Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions."

1  adjudication resulted in a decision that was (1) "contrary to, or involved an unreasonable

2  application of, clearly established Federal law, as determined by the Supreme Court of the United

3  States," or (2) "based on an unreasonable determination of the facts in light of the evidence

4  presented in the State court proceeding." 28 U.S.C. § 2254(d).  The petitioner's burden is great.

5  *See Richter*, 562 U.S. at 103 ("[To gain relief under § 2254(d)(1), a petitioner] must show that the

6  state court's ruling . . . was so lacking in justification that there was an error well understood and

7  comprehended in existing law beyond any possibility for fairminded disagreement."); *see Davis*

8  *v. Ayala*, 576 U.S. 257, 271 (2015) (quoting § 2254(e)(1)) ("[Under § 2254(d)(2), s]tate-court

9  factual findings . . . are presumed correct; the petitioner has the burden of rebutting the

10  presumption by 'clear and convincing evidence.'").

11       If obtaining habeas relief under § 2254 is difficult, "that is because it was meant to be."

12  *Richter*, 562 U.S. at 102.  As the Supreme Court has put it, federal habeas review "disturbs the

13  State's significant interest in repose for concluded litigation, denies society the right to punish

14  some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises

15  of federal judicial authority."  *Id*. at 103 (citation omitted).  Our habeas review authority serves as

16  a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for

17  ordinary error correction through appeal."  *Id*. at 102-103 (emphasis added).

18       Here, the Court of Appeal issued the last reasoned decision on petitioner's claims.

19  Because that Court rejected his claims on the merits, the deferential standard of § 2254 applies.

20       **a. Waiver of Counsel**

21       Petitioner claims that his waiver of counsel was involuntary.  ECF No. 1 at 5.

22  Specifically, petitioner argues that he was forced to choose between the right to counsel and the

23  right to a speedy trial, rendering his waiver of counsel involuntary.  *Id*.  The Court of Appeal

24  rejected petitioner's claim, finding that petitioner failed meet his "burden to prove he did not

25  knowingly, intelligently, and voluntarily waive his right to counsel."  ECF No. 12-10 at 10

26  (quoting *Iowa v. Tovar,* 541 U.S. 77, 92 (2004)).

27       "The right to the assistance of counsel guaranteed by the Sixth and Fourteenth

28  Amendments is indispensable to the fair administration of our adversarial system of criminal

7

1  justice." *Maine v. Moulton*, 474 U.S. 159, 168 (1985).  Criminal defendants have a constitutional

2  right to counsel at all critical stages of their criminal proceedings, including the criminal trial.

3  *United States* v. *Wade,* 388 U.S. 218, 224 (1967).  Waiver of the right to counsel must be a

4  "knowing, intelligent ac[t] done with sufficient awareness of the relevant circumstances."

5  *Brady* v. *United States,* 397 U.S. 742, 748 (1970); *see Adams* v. *United States ex rel.*

6  *McCann,* 317 U.S. 269, 279 (1942) (noting that waiver is intelligent where the defendant "knows

7  what he is doing and his choice is made with eyes open").  A defendant wishing to waive the right

8  to counsel must be made aware of the nature of the charges against him, the possible penalties he

9  faces, and the dangers and disadvantages of representation.  *See McCormick v. Adams*, 621 F.3d

10  970, 977 (9th Cir. 2010).  There is, however, no "formula or script to be read to a defendant who

11  states that he elects to proceed without counsel."  *Tovar,* 541 U.S. at 88.

12       The undersigned cannot find that the Court of Appeal's rejection of petitioner's claim was

13  an unreasonable application of clearly established federal law.  Petitioner has failed to show that

14  his waiver of counsel was not knowing, intelligent, and voluntary.  *See Tovar,* 541 U.S. at 92.

15  The record reveals that the trial court took great care to ensure that petitioner understood the

16  nature of his charges, the potential penalties he faced, and the risks of self-representation.  *See*

17  *McCormick*, 621 F.3d at 977.  Upon petitioner's indication to the court that he wished to represent

18  himself, the trial court questioned petitioner about his educational background and warned him of

19  the difficulties of self-representation.[2]  ECF No. 12-10 at 9.  Petitioner stated that he wanted to

20  waive counsel due to delays in his trial date and that he did not need counsel because he

21  possessed evidence that would prove his innocence.  *Id*.  The court granted petitioner's motion to

---

22  [2] At the hearing on petitioner's motion to withdraw, the court advised petitioner that he would be
23  proceeding "under the same terms and conditions as a lawyer" and that the "nature of the case is
    extremely serious."  ECF No. 11-5 at 4-5.  The court stated that self-representation is "a very
24  risky procedure" and "in the event you are convicted, you have nobody to blame but yourself."
    *Id*. at 6-7.  The court warned petitioner as follows: "if you're convicted, that means you could
25  never see the light of day again . . . [y]ou'll be behind bars potentially the entire rest of your life"
    and "you are probably guaranteeing that you're going to be convicted."  *Id*. at 7.  When asked
26  whether petitioner understood these admonitions, petitioner repeatedly stated "yes."  *Id*. at 4-7.
27  At a subsequent hearing, the petitioner asked whether he would have an opportunity to withdraw
    his waiver of counsel before trial and that court stated "yes, that is possible."  ECF No. 11-1 at
28  134.  Petitioner stated "[t]hen I choose to represent myself for now."  *Id*.

represent himself and petitioner then signed, initialed, and dated a written waiver of counsel. *Id*. at 9-10.  In multiple pre-trial hearings, the trial court advised petitioner against self-representation and gave him numerous opportunities to withdraw his waiver of counsel.[3] *Id*.  In each of these instances, petitioner indicated that he understood the gravity of his decision to represent himself and that he wished to proceed pro se.

Neither can this court find that the Court of Appeal's rejection of petitioner's claim was an unreasonable determination of the facts.  As stated above, the trial court provided petitioner with multiple warnings of the risks of self-representation and numerous opportunities to withdraw his waiver of counsel.  Based on its multiple interactions with petitioner at pre-trial hearings, the trial court found that petitioner was intelligent and understood the gravity of his decision to waive his right to counsel, a finding with which petitioner agreed. ECF No. 11-7 at 16.  Accordingly, petitioner's claim should be rejected.[4]

_____

[3] About a month before trial, the trial gave petitioner the opportunity to withdraw his waiver and have counsel appointed, stating, "I'm very concerned about your ability to prepare yourself adequately."  ECF No 11-6 at 18-19.  Petitioner stated, "I don't want to waive time, I want to have [the trial] this month." *Id*. at 19.  The court warned petitioner that he had no way to review some of the state's electronic evidence against him. *Id*.  Petitioner stated that he understood and still wanted to represent himself. *Id*. at 20.  The court stated that "any attorney, even the worst attorney . . . would be able to do a better job." *Id*. at 21.  The trial court reminded petitioner that because he did not know the rules of evidence, that he would not be able to keep damaging evidence from being presented. *Id*. at 29.  At a hearing less than two weeks before trial, the court stated that "the trial is imminent" and "it would be foolish for you to proceed without an attorney." ECF No. 11-7 at 4.  Petitioner declined the trial court's offer to appoint him an attorney. *Id*.  The court advised petitioner that he did not understand how to request discovery from the state, how to issue subpoenas, and how to present evidence properly at trial. *Id*. at 9.  In referencing his ability to obtain potentially exculpatory evidence, petitioner stated he would "take his chances." *Id*. at 15.

[4] To the extent that petitioner also implicitly claims that his right to a speedy trial was violated, his claim fails. Petitioner argues that his counsel's agreement to (and request for) multiple continuances in his case caused petitioner to waive his right to counsel in order to preserve his right to a speedy trial.  The U.S. Supreme Court has held that such scheduling matters do not require the express assent of the defendant. *See New York v. Hill*, 528 U.S. 110, 115 (2000).  Rather, "scheduling matters are plainly among those for which agreement by counsel generally controls" because "only counsel is in a position to assess whether the defense would even be prepared to proceed any earlier." *Id*.  The speedy trial right "is consistent with delays and depends upon circumstances." *Barker v. Wingo*, 407 U.S. 514, 521-22 (1972).  Granting a continuance "is not a violation of the right to speedy trial unless the circumstances of the case are such that further delay would endanger the values the right protects." *Id*.  Petitioner has presented

9

1               **b.  Jury Instructions**

2            Petitioner claims that the trial court erred when it failed to instruct the jury on the proper

3 procedure for considering conflicting evidence and accomplice testimony.  ECF No. 1 at 7-8.

4 Generally, claims of instructional error raise questions of state law and are not cognizable on

5 federal habeas review.  *See Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991) ("[T]he fact that [an]

6 instruction was allegedly incorrect under state law is not a basis for [federal] habeas relief.").  To

7 the extent that petitioner claims that the absence of certain jury instructions violated his federal

8 constitutional rights, his claims should be rejected.[5]

9                 **i.  Conflicting Evidence Instruction**

10            Petitioner claims that the trial court erred because it failed to instruct the jury with Judicial

11 Council of California Criminal Jury Instruction 302 ("CALCRIM No. 302").  ECF No. 1 at 7.

12 Petitioner contends that because there was conflicting testimony presented at trial, the court had a

13 duty to instruct with CALCRIM No. 302 *sua sponte*.[6]  *Id*.  The Court of Appeal found that there

14 was conflicting testimony presented at trial regarding petitioner's involvement in the crimes and,

15 accordingly, that the trial court erred when it failed to instruct the jury with CALCRIM 302.  *Id*.

16 at 16.  However, the Court of Appeal found the error harmless.  *Id*.

17            When "a state court determines that a constitutional violation is harmless," as the Court of

18 Appeal has done here, "a federal court may not award habeas relief under § 2254 unless *the*

19 *harmlessness determination itself* was unreasonable."  *Fry v. Pliler*, 551 U.S. 112, 119 (2007)

20 (emphasis in original).  Harmless error is found where a constitutional error had a "substantial

21 and injurious effect or influence" on either a jury verdict or a trial court decision.  *Brecht v.*

22 _____

23 no evidence that the continuances in his case endangered his right to a speedy trial.  On the
contrary, the trial court feared that the fast pace of petitioner's criminal proceedings did not

24 provide enough time for petitioner to adequately prepare for trial, noting that murder trials "would
never progress this rapidly" normally.  ECF No. 11-6 at 19.

25 [5] Petitioner submitted his appellate opening brief before the California Court of Appeal with the
instant petition, and the undersigned will consider his related Fourteenth Amendment argument

26 contained therein.  ECF No. 1 at 30-32.

27 [6] CALCRIM No. 302 instructs that where "there is a conflict in the evidence, [the jury] must
decide what evidence, if any, to believe.  Do not simply count the number of witnesses who agree

28 or disagree on a point and accept the testimony of the greater number of witnesses."  ECF No. 12-
10 at 15.

1    *Abrahamson*, 507 U.S. 619, 623 (1993).  A state-court decision is not unreasonable if "fairminded

2    jurists could disagree on [its] correctness."  *Richter*, 562 U.S. at 101.  Petitioner must show that

3    the state court's harmless error determination "was so lacking in justification that there was an

4    error well understood and comprehended in existing law beyond any possibility for fairminded

5    disagreement."  *Id*.

6            Petitioner has failed to show how the Court of Appeal's harmlessness determination meets

7    the requirement of *Richter*.  The Court of Appeal reasoned that the other instructions given to the

8    jury were sufficient to guide the jury in its consideration of the conflicting evidence.[7]  Moreover,

9    because the prosecutor did not urge the jury to compare the number of witnesses each side

10   presented and the evidence presented at trial "overwhelmingly established" petitioner's guilt, the

11   Court of Appeal found that there was "nothing to suggest that the absence of the instruction

12   prevented the jury from evaluating the evidence."  *Id*. at 16-17.  The evidence of petitioner's guilt

13   included: Luis and Bravo's testimony that petitioner shot Ibarra and that a white male who was

14   with petitioner fled the scene of the crime, Bravo's testimony that he saw petitioner take Ibarra's

15   wallet, Guillermo's testimony that he recognized petitioner's voice as that of the person who held

16   a gun to Luis's head during the incident, and Brannum's testimony that he witnessed petitioner at

17   the crime scene with a gun.  *Id*. at 17-18.  The jury also heard that petitioner was detained by law

18   enforcement five days after the crime in Monterey County with a suitcase of clothing.  *Id*.  The

19   jury heard no evidence to corroborate petitioner's testimony that he was on vacation with family

20   members at the time of his detention.  *Id*.  Accordingly, the Court of Appeal found that there was

21   "no reasonable probability that instructional error affected the outcome of the trial" and it was not

22

23

24

_____

25   [7] Specifically, the Court of Appeal found the instructions sufficient because the jury was given
     the following instructions: how to regard witness credibility (CALCRIM Nos. 105, 226); how to
26   draw inferences from direct and circumstantial evidence (CALCRIM No. 223); the requirement
     for sufficient evidence to support circumstantial evidence (CALCRIM No. 224); that one person's
27   testimony is sufficient to prove any fact (CALCRIM No. 301); and how to evaluate eyewitness
     testimony (CALCRIM No. 315).  ECF No. 12-10 at 17.
28

1  "reasonably probable that the jury would have reached a different result had CALCRIM No. 302

2  been given." *Id.*

3      Petitioner has failed to show that the Court of Appeal's harmlessness determination,

4  which was supported by the record, "was so lacking in justification that there was an error well

5  understood and comprehended in existing law beyond any possibility for fairminded

6  disagreement." *Richter*, 562 U.S. at 101. Petitioner has neither presented evidence of prejudice

7  resulting from the lack of the instruction, nor that the lack of the instruction influenced the jury's

8  verdict in an unconstitutional manner. Therefore, petitioner's claim should be rejected.

9                              **ii.  Accomplice Instruction**

10      Petitioner claims that the trial court erred when it failed to instruct the jury that, under

11  CALCRIM Nos. 334 and 707, accomplice testimony must be corroborated.[8] ECF No. 1 at 8.

12  Petitioner claims that a reasonable juror could have found that Brannum was an accomplice, and

13  therefore, that the trial court prejudicially erred in failing to instruct the jury that Brannum's

14  testimony should have been viewed with caution. *Id.* The Court of Appeal rejected petitioner's

15  claim, finding that the trial court had no obligation to provide the accomplice instruction because

16  there was not substantial evidence in the record to support the conclusion that Brannum was an

17  accomplice, such as "evidence that Brannum did anything to assist, encourage, or aid" petitioner.

18  ECF No. 12-10 at 20. Additionally, the Court of Appeal found that if there were any error in the

19  trial court's failure to instruct, it was harmless. *Id.* The Court of Appeal reasoned that the

20  "corroborating evidence of [petitioner's] guilt was overwhelming based on evidence other than

21  Brannum's testimony" and that the "other witnesses more than adequately connected [petitioner]

22  with the commission of [the] crimes." *Id.* at 21

23      Again, petitioner has failed to show that the Court of Appeal's harmlessness determination

24  was unreasonable, meaning that it "was so lacking in justification that there was an error well

25  understood and comprehended in existing law beyond any possibility for fairminded

26  _____

27  [8] In California, when an accomplice testifies in a manner that implicates the defendant, the trial court must *sua sponte* instruct the jury that such testimony "is to be viewed with distrust and that the defendant may not be convicted on the basis of an accomplice's testimony unless it is

28  corroborated." *People v. Hayes*, 21 Cal. 4th 1211, 1271 (1999).

1    disagreement." *Richter*, 562 U.S. at 101.  There was not sufficient evidence in the record to

2    support a finding that Brannum was an accomplice.  Even if the undersigned were to presume that

3    such evidence was presented, the jury heard evidence from multiple other witnesses that could

4    support petitioner's conviction.  For example, the jury heard testimony from other witnesses that

5    petitioner was at the scene of the crime with a gun and shot the victim.  Petitioner has neither

6    presented evidence of prejudice resulting from the lack of an accomplice instruction, nor evidence

7    that the lack of an instruction influenced the jury's verdict in an unconstitutional manner.

8    Therefore, petitioner's claim should be rejected.

9              **c.   Request for In-Camera Review**

10         Petitioner also requests that this court review certain sealed documents produced by the

11    sheriff's department in response to petitioner's subpoena and the sealed transcript of an in-camera

12    review hearing conducted by the trial court so that this court may determine whether the trial

13    court ordered the state to turn over all documents to which petitioner was entitled.  ECF No. 1 at

14    10.  A request for in-camera review of state court evidentiary proceedings is not cognizable on

15    federal habeas review.  *See Maine v. Sherman*, No. 117CV01307AWIJLTHC, 2018 WL 646127,

16    at *22 (E.D. Cal. Jan. 31, 2018); *Williams v. Malfi*, No. CV 06-4367-DOC JTL, 2008 WL

17    618895, at *9 (C.D. Cal. Jan. 25, 2008).  To the extent petitioner may be requesting an

18    evidentiary hearing, such a hearing is justified only when the material facts were not adequately

19    developed at the state-court hearing.  *See Stanley v. Schriro*, 598 F.3d 612, 624 (9th Cir. 2010)

20    (citing *Townsend v. Sain*, 372 U.S. 293 (1963)).  There is no such justification here.  In his direct

21    appeal, petitioner requested that the Court of Appeal review the sealed documents and transcript

22    of the in-camera hearing, ECF 12-5 at 32, and the Court of Appeal did so.  ECF No. 12-10 at 14-

23    15.  The Court of Appeal found that petitioner's defense counsel "received all of the documents

24    that were submitted by the custodian of record for the Sheriff's Department in response to

25    [petitioner's] subpoena," and noted that the "record does not establish that any documents were

26    withheld from the defense."  *Id*. at 15.  Because the material facts were adequately developed in

27    state court—a conclusion that petitioner does not rebut—the undersigned declines petitioner's

28    invitation to review them again here.  *See also* 28 U.S.C. § 2254(e) ("[A] determination of a

1    factual issue made by a State court shall be presumed to be correct," and a petitioner "shall have

2    the burden of rebutting the presumption of correctness by clear and convincing evidence.").[9]

3    ### III.    Certificate of Appealability

4           A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district

5    court's dismissal of a petition; he may appeal only in limited circumstances. *See* 28 U.S.C.

6    § 2253; *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). Rule 11 Governing Section 2254

7    Cases requires a district court to issue or deny a certificate of appealability when entering a final

8    order adverse to a petitioner. *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116

9    F.3d 1268, 1270 (9th Cir. 1997). A certificate of appealability will not issue unless a petitioner

10   makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

11   This standard requires the petitioner to show that "jurists of reason could disagree with the district

12   court's resolution of his constitutional claims or that jurists could conclude the issues presented

13   are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *accord*

14   *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Here, petitioner has not made a substantial

15   showing of the denial of a constitutional right. Thus, the undersigned recommends that the court

16   decline to issue a certificate of appealability.

17   ### IV.    Findings and Recommendations

18          For the foregoing reasons, the undersigned recommends that the court deny the petition,

19   ECF No. 15, and decline to issue a certificate of appealability. These findings and

20   recommendations are submitted to the U.S. district judge presiding over the case under 28 U.S.C.

---

21   [9] If petitioner intends to make that underlying claim that the trial court erred by failing to release

22   all documents containing material evidence, the undersigned recommends that such a claim be
     denied. After the Court of Appeal granted petitioner's request to review the documents and

23   hearing transcripts, it found that petitioner did not suffer a violation of his due process rights
     because the trial court ordered the release of all documents to petitioner produced by the sheriff's

24   department in response to petitioner's subpoena. ECF No. 12-10 at 14-15. This court owes
     deference to the factual findings of a state appellate court where the parties to the matter were

25   "given an opportunity to be heard and [the issue] received plenary consideration" before the court
     made its finding. *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981). The undersigned finds that

26   petitioner received the opportunity to be heard on this matter and that the Court of Appeal
     conducted the "plenary review" required by *Mata*. Accordingly, this court must give deference to

27   the Court of Appeal's factual findings that petitioner received all documents submitted by the

28   sheriff's department.

§ 636(b)(1)(B) and Local Rule 304.  Within thirty days of the service of the findings and recommendations, the parties may file written objections to the findings and recommendations with the court and serve a copy on all parties.  That document must be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The presiding district judge will then review the findings and recommendations under 28 U.S.C. § 636(b)(1)(C).

**V.      Order**

Plaintiff's request for an in-camera review of sealed documents, ECF No. 1 at 10, is denied.


IT IS SO ORDERED.


Dated:    September 4, 2020

UNITED STATES MAGISTRATE JUDGE


Nos. 205 and 206.